## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MARIO MARQUEZ,

        Plaintiff,

v.                                    No. CV-10-1061 CG

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiff's *Motion to Remand or Reverse the Administrative Agency Decision* (Doc. 15) ("Motion"), filed on April 1, 2011.  The parties consented to have the undersigned magistrate judge conduct all proceedings and enter final judgment. (Docs. 6, 9)  The Court has reviewed the Motion, (Doc. 15), Plaintiff's *Memorandum in Support of Plaintiff's Motion to Reverse of Remand Administrative Agency Decision* (Doc. 16), Defendant's *Brief in Response to Plaintiff's Motion to Reverse and Remand* (Doc. 17), and Plaintiff's *Reply to Defendant's Response to Plaintiff's Motion to Reverse/Remand* (Doc. 18).

Plaintiff argues that he should have been found to be disabled at step three of the sequential evaluation process because his back injury meets or equals the criteria for the Listing of spinal disorders at § 1.04. (Doc. 16 at 9-15). He also claims that the Administrative Law Judge ("ALJ") failed to develop an adequate record at the disability hearing when she prevented his attorney from eliciting relevant testimony regarding his physical and mental limitations. (*Ia.* at 16, 18-19, 21). Plaintiff further claims that the ALJ's findings regarding his residual functional capacity to work were not supported by substantial evidence.

The Commissioner maintains that substantial medical evidence supports the ALJ's finding that Plaintiff's impairments did not meet or equal the definition of the Listings at § 1.04. (Doc. 17 at 4-11). The Commissioner further argues that sufficient evidence was presented at the hearing regarding Plaintiff's limitations and that the ALJ properly considered all of Plaintiff's limitations in assessing his residual functional capacity to work. (*Id.* at 12-13, 15-16).

Having considered the parties' filings, the relevant law, and having meticulously reviewed and considered the entire administrative record ("AR"), the Court finds that the ALJ failed to properly develop the record regarding Plaintiff's limitations. Therefore, the Court will **GRANT** Plaintiff's Motion and **REMAND** the case to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

## I.   <u>Standard of Review</u>

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied.  *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)).  If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief.  *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).  A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.  *Hamlin*, 365 F.3d at 1214; *Langley*,

373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214; *Doyal*, 331 F.3d at 760. An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214. While a court may not re-weigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## II.   Applicable Law and Sequential Evaluation Process

For purposes of disability insurance benefits (DIB) and supplemental security income (SSI), a person establishes a disability when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 405.1505(a), 416.905(a).

In light of this definition for disability, a five-step sequential evaluation process (SEP) has been established for evaluating a disability claim. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the SEP, the

claimant has the burden to show that: (1) he is not engaged in "substantial gainful activity." At the second step, the claim must show that (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) his impairment(s) either meet or equal one of the "Listings"[1] of presumptively disabling impairments; or (4) he is unable to perform his "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261.  At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity ("RFC"), age, education, and work experience.  *Grogan*, 399 F.3d at 1261.

### III.    Background

#### a.    Medical Background

Mario Marquez is a 59 year old man with a high school diploma, a Bachelor of Science degree in Business Administration, and an Associate of Science Degree in Computer Technology. (Doc. 16 at 2).  He has held various jobs, including that of a health care administrator, business center manager, hospital department manager, cardiopulmonary technician, and computer software consultant. (*See* Administrative Record ('AR') at 124-138). He has had a history of back and spinal problems. He underwent back fusion surgery in 1970 and, in May of 2004, he wrenched his back when stepping in a hole. (*Id.* at 407). His back pain worsened considerably following that incident and is the subject of Plaintiff's continued efforts to obtain disability insurance benefits.

---

[1] 20 C.F.R. pt. 404, subpt. P, app. 1.

Documentation of Plaintiff's medical treatment following the May, 2004, incident is extensive. The Honorable United States Magistrate Judge Don J. Svet provided a comprehensive overview of Plaintiff's medical care from the initial injury until February of 2005 and the Court will incorporate those findings for the purpose of this Memorandum Opinion and Order. (*See* Civ. 06-956 DJS, Doc. 17 at 4-15). The record indicates that Plaintiff began experiencing extensive back pain in the weeks after he stepped in the hole. Dr. Cleveland Sharp, Plaintiff's primary physician at the Lovelace Medical Center, saw Plaintiff on July 2, 2004. (*Id.* at 446). Dr. Sharp noted that Plaintiff was "in moderate distress" throughout the examination and the doctor found "extensive spasm and tenderness" in Plaintiff's back. (*Id.* at 448). Dr. Sharp found that Plaintiff was suffering from acute back pain and x-rays of the lumbosacral spine indicated "postoperative changes following lumbar fusion spanning L5-S1." (*Id.* at 446). The x-rays also showed "exaggerated lumbar lordosis [and] retrolisthesis of L3 on L4 [of] several millimeters . . . [and] degenerative facet changes . . .." (*Id.* at 446-47).

Dr. Sharp referred Plaintiff to Dr. Julie Muche, a physician specializing in physical medicine and rehabilitation at the Lovelace Medical Center. Dr. Muche saw Plaintiff on July 26, 2004, and she found that Plaintiff was experiencing coccygeal pain which radiated down into his lower right extremity and which he described as "burning, shooting, throbbing, constant pain." (*Id.* at 434-35). Dr. Muche noted that the July 2, 2004, x-rays showed "degenerative disk [sic] disease prominent at multiple level[s] and a several millimeter retrolisthesis at L3 and L4." (*Id.* at 435). She recommended certain physiotherapy techniques and she also prescribed Roxicet, Valium, and Nortriptyline to ease the pain and resulting insomnia. (*Id.* at 439-40).

5

When Dr. Muche examined Plaintiff again in August of 2004, she found that the Nortriptyline was somewhat effective, but that Plaintiff continued to experience coccygeal pain and that he had a painful trigger point over the right paraspinal muscle. (*Ia.* at 225-26). Dr. Muche increased the dosage of Nortriptyline and prescribed a 2% lidocaine topical gel. (*Ia.*). Dr. Muche also administered a trigger point injection over the right paraspinal muscle in an effort to control the pain. (*Id.*).

In September of 2004, Dr. Sharp referred Plaintiff to Dr. Mark Erasmus, a surgeon at the Lovelace Medical Center. (AR at 510-11). Plaintiff met with Dr. Erasmus on September 30, 2004, and Dr. Erasmus discussed the possibility of back surgery. (*Id.* at 511). Plaintiff agreed to an epidural spinal injection in the hopes that it would resolve his back pain without needing surgery. (*Id.* at 511).

The injection did resolve the back pain, and Plaintiff next saw Dr. Steven Bailey, a physiatrist at Lovelace Medical on October 11, 2004. (*Id.* at 512-13). Plaintiff reported that the previous injections had provided relief for several weeks but that the pain then returned. (*Id.* at 512). The pain worsened with prolonged sitting and Plaintiff reported tenderness over the right paraspinous muscles as well as tenderness around the coccyx. (*Id.*). Dr. Bailey diagnosed Plaintiff with chronic low back pain and post fusion coccydynia.[2] Dr. Bailey recommended a lumbar epidural steroid injection, which he administered that same day. (AR at 512-13).

---

[2] Coccydynia is pain localized in or around the pelvis and coccyx which frequently has not identifiable source but which is typically severe and persistent. It can compromise a patient's ability to function effectively by causing, *inter alia*, "immediate and severe pain when moving from sitting to standing" as well as a deep ache in the tailbone region. *See,* *http://my.clevelandclinic.org/disorders/coccydynia/hic_coccydynia_tailbone_pain.aspx*

Despite the temporary relief afforded by the trigger point and epidural injections, Plaintiff's back pain returned every time within a few weeks. Plaintiff met again with Dr. Erasmus in October of 2004 to discuss his options. (*Id.* at 510-11). Plaintiff reported to Dr. Erasmus that he had been experiencing constant, sharp, severe lumbar spinal pain over the last two months and that the pain radiated down his right leg. (*Id.* at 510). He reported that the pain worsened while sitting down and that both forward and backward bending and even light touching produced pain. (*Id.*). Dr. Erasmus diagnosed Plaintiff with spinal stenosis and he recommended surgery due to the spinal stenosis and persistent pain. (*Id.* at 204, 510-11).[3] Plaintiff agreed to the procedure and underwent an L3-4 foraminotomy on October 29, 2004. (*Id.* at 509-11).[4] While the pain abated following the surgery, it reemerged within several weeks. (*See, e.g.*, *Id.* at 219). During checkup appointment with Dr. Erasmus on January 27, 2005, scarring was found around the surgical site. (*Id.* at 505).

On February 3, 2005, Plaintiff returned to Lovelace Medical and was seen by Dr. Malizzo. (*Id.* at 503). Plaintiff continued to complain of lower back pain that radiated down into the right buttocks, which sometimes caused his right leg to ache. (*Id.*). By reference to an MRI, Dr. Malizo found continuing nerve encroachment at L3-4 and L4-5. (*Id.*). Dr.

---

[3] Spinal stenosis, also known as lumbar canal stenosis, is the "narrowing of the spinal canal or the tunnels through which nerves and other structures communicate with that canal." Symptoms of spinal stenosis include pain, numbness, weakness in the legs, groin, hips, buttocks, and lower extremities. Symptoms typically worsen when walking or standing and frequently abate when lying or sitting down. *See, e.g.*, *http://my.clevelandclinic.org/disorders/Stenosis_Spinal/hic_Lumbar_Canal_Stenosis.aspx*

[4] A foraminotomy, also referred to as spinal decompression surgery, is a procedure to expand the openings for nerve roots to exit the spinal column by removing a substantial amount of bone and/or tissue. *See, e.g.*, *http://my.clevelandclinic.org/services/spinal_decompression_surgery/hic_spinal_decompression_surgery.aspx*

Malizzo administered another epidural steroid injection and continued his pain prescription for Vicoprofen 4. (*Id.*). Dr. Malizzo saw Plaintiff again on April 19, 2005. (*Id.* at 501). Plaintiff continued to complain of pain in his lower back, right buttocks, and an aching sensation in his right leg. (*Id.*). Dr. Malizzo found that Plaintiff was suffering from degenerative disc change with radicular pain and postlaminectomy syndrome. (*Id*).[5] Dr. Malizzo increased Plaintiff's prescription for Vicoprofen 4. (AR at 501). A notation in Dr. Malizzo's report indicates he told Plaintiff's wife that he was reluctant to place Plaintiff at "total and permanent disability." (*Id.*).

Plaintiff continued to see Dr. Muche repeatedly between 2005 and 2008. (*See, e.g.*, *Id.* at 400 (noting that Dr. Muche saw Plaintiff at least eight times between 2005 and 2007)). She saw Plaintiff in October of 2005 and found that Plaintiff had increased coccygeal pain, pelvic pain, continued spasms, tenderness to palpation, and that both left and right flexion and rotation of the spine produced pain. (*Id.* at 484-85). She performed a L4-5 left-sided facet injection and a coccyx injection in November of 2005 to treat his back pain. (*Id.* at 481). Between 2005 and 2008, Dr. Muche and a pharmacologist named Ernest Dole helped to manage his pain both by increasing medication dosages and prescribing narcotics such as morphine, oxycodone, and MS Contin. (*See, e.g.*, *Id.* at 454-63, 471-76). Dr. Muche administered another bilateral L4-5 facet injection in October of 2006 and two trigger point injections in November of 2007 in an effort to alleviate the pain. (*Id.* at 453,

---

[5] Post-laminectomy syndrome, also known as failed back surgery syndrome, is used broadly to describe poor outcomes following back surgery. Symptoms typically include low back pain, stiffness, local tenderness, and pain radiating down into the legs. *See,* *http://www.mdguidelines.com/post-laminectomy-syndrome*

8

461). She then administered two more trigger point injections in March of 2008. (*Id*. at 452). Plaintiff stated that, while the narcotic medications enabled him to manage his pain, they prevented him from concentrating or performing calculations. (*Id*.).

### b.    Procedural Posture

### i.    First Decision and Remand

Plaintiff initially filed for disability insurance benefits on January 3, 2005, alleging that he had been disabled since July 12, 2004, due to his degenerative disc disease, osteoarthritis, and sacroiliac joint dysfunction. (*Id*. at 13, 15). The proceedings leading up to the first remand are relevant to this appeal because an examination of the evidence developed at the first hearing provides support for Plaintiff's claim that the ALJ failed to develop the record following the remand.

In support of his first application for benefits, Plaintiff submitted his medical records as well as a disability questionnaire filled out by Dr. Cleveland Sharp on July 21, 2005. Dr. Sharp's questionnaire indicated that he had been treating Plaintiff for over a year. (*Id*. at 100). He assessed degenerative changes to Plaintiff's spine as well as limited range of spinal motion and tender muscles. (*Id*.). Dr. Sharp stated that Plaintiff would be unable to work full time, that he would be able to work a maximum of six or seven hours a day and that he would need rest breaks of approximately five minutes every hour. (*Id*. at 101). Plaintiff's condition would result in frequent absences and Plaintiff would likely miss several days of work every month. (*Id*.). Plaintiff would not be able to sit, stand, or walk continuously for one hour and would not be able to stand or walk for more than an hour in an eight hour day. (*Id*. at 102). The doctor believed that Plaintiff would be able to sit for six

hours out of eight, so long as he was able to take five minute breaks every hour. (*Id.*). Dr. Sharp stated that Plaintiff's condition had continued at that severity for over a year and that it was expected to continue indefinitely. (*Id.* at 104). Plaintiff also submitted a Federal Family Education Loan Program form filled out by Dr. Muche in November of 2005 wherein she stated that Plaintiff was unable to work due to his osteoarthritis, sacroiliac joint dysfunction, coccygeal pain, and his subsequent surgery. (*Id.* at 230).

Administrative Law Judge Barbara Perkins held on a hearing on November 30, 2005. (*Id.* at 239). During the hearing Plaintiff testified that it was difficult for him to remain sitting for more than 20-30 minutes at a time and that he experienced severe lower back and coccygeal pain. (*Id.* at 254, 262). After sitting for twenty minutes, he typically had to lie down to reduce pressure on his back. (*Id.* at 263). Plaintiff had to stand up and down several times during the hearing due to his discomfort. (*Id.* at 253, 262). He testified that the  combination of Roxicet, MS Contin, and Robaxin, which he took three times daily, frequently made him tired and impeded his concentration and ability to be productive. (*Id.* at 263-67, 271-72).

ALJ Perkins denied Plaintiff's application for benefits on May 22, 2006. She found that Plaintiff's condition did not meet the definition of the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, App. 1, § 1.04(A-C) (disorders of the spine). She found that Plaintiff's statements regarding the intensity, duration, and limiting effects of his pain were "not entirely credible." (*Id.* at 17). She relied primarily on Dr. Malizzo's report that he was unprepared to place Plaintiff on "total and permanent disability." (*Id.* at 16, 18). Based on the testimony of a vocational expert at the hearing, the ALJ found that Plaintiff retained the residual functional capacity to work as either a data entry clerk, billing clerk, or information

clerk. (*Id.* at 20-21).

Plaintiff appealed the ALJ's decision to the District Court and United States Magistrate Judge Don J. Svet was assigned to review the case. (Civ. 06-956 DJS). In August of 2007, Judge Svet remanded the case to the Commissioner. He found that the ALJ's decision to credit Dr. Malizzo's opinion over that of Dr. Muche was not supported by the record. (*Id.* at 17). Judge Svet further rejected the ALJ's finding that Plaintiff was not suffering from severe pain:

> The record indicates that a neurosurgeon and three physiatrists diagnosed Marquez with very serious disorders, a bulging intervertebral disc, facet atrophy . . . right L3-4 stenosis, coccydnia, retrolisthesis of L3 and L4, degenerative disc disease of the lumbar spine (with small osteophytes), osteoarthritis and post-laminectomy syndrome. Moreover, Marquez underwent several invasive procedures including surgery, epidural steroids, and trigger point injections in order to obtain relief from his pain. Marquez was also taking narcotic analgesics and muscle relaxants on a regular basis and required increased amounts after his surgery. Thus, the ALJ's reason for dismissing Mr. Marquez' complaints of severe pain, i.e. "relatively weak medical evidence," is not supported by the record.

(Civ. 06-956 DJS, Doc. 17 at 17-18) (internal citations omitted). Judge Svet remanded the case with instructions to order a formal functional capacity assessment from Dr. Muche and to have Dr. Muche opine as to whether Plaintiff met the Listing definition for spinal disorders. (*Id.* at 18).

## ii.   Post-Remand Proceedings

Shortly after Judge Svet remanded the case, Dr. Muche filled out a questionnaire which included a definition of the Listing at § 1.04 - disorders of the spine. Dr. Muche noted that she had been treating Plaintiff since July of 2004 and she diagnosed him with post-laminectomy syndrome, coccyx pain, degenerative disc disease, disc bulge, and osteoarthritis. (*Id.* at 400).  She stated that she has been treating him with medications,

injections, physical therapy, and an osteopathic referral. (*Id.*). She echoed Dr. Sharp's earlier finding that Plaintiff would need frequent rest breaks of at least 5 minutes per hour. (*Id.* at 401). She concluded that Plaintiff met the Listing of Impairments definition for § 1.04(A) and that he was unable to work. (*Id.*). She stated that his condition had continued at that level of severity since July of 2004, and that it was permanent. (*Id.* at 405).

### iii.   <u>Second Hearing</u>

ALJ Perkins held a second hearing on March 6, 2008. (*Id.* at 544). Vocational Expert ("VE") Daniel Moriarty was present and testified at the hearing. Plaintiff explained that, following his injury in May of 2004, his condition deteriorated up until the time he elected to have a surgical foraminotomy in October of 2004. (*Id.* at 565-67). While his condition improved for a week or so following the surgery, the pain returned shortly thereafter and his condition had not improved since then. (*Id.* at 569-70). He claimed that, following the injury, he was unable to work or function and that he spent much of his time lying down, reading, and taking medications. (*Id.* at 567-68). He briefly stated that the drugs interfered with his memory and concentration. (*Id.* at 568-69, 571).

Plaintiff's attorney attempted to ask about the limiting effects of his pain and the effects of the narcotic medications on his ability to concentrate, but the ALJ interrupted to pose her own questions about Plaintiff's physiotherapy and his level of physical activity. (*Id.* at 571-80). Upon examination by the ALJ, Plaintiff testified that he was taking several prescription medications, including Roxicet, Robaxin, and morphine sulfate. (*Id.* at 574). He took the medications three times a day, once at 7 am, once at 1 pm, and then around bedtime. (*Id.*). If he exacerbated his back pain during the day, he was allowed to take an extra dose of all three medications. (*Id.*). Because the ALJ kept cutting off Plaintiff's

attorney and interposing her own questions, Plaintiff's attorney was unable to question him about his physical limitations or about the effect that the drugs had on his ability to concentrate or be productive. (*See, e.g.*, *Id* at 587-88). Plaintiff's attorney objected to her examination being cut short but the ALJ dismissed the objection, stating that her own questioning of Plaintiff  had established his limitations with regard to sitting, standing and walking. (*Id.* at 587-89). With regard to the side-effects of the medication, the ALJ suggested that Plaintiff's attorney could develop that testimony through cross-examination of the VE. (*Id.* at 589-90).

The ALJ presented a hypothetical to VE Moriarty which she felt adequately tracked Plaintiff's limitations. The hypothetical was for a man of similar age, education and vocational background as Plaintiff who could carry or lift no more than ten pounds either frequently or occasionally. (*Id.* at 582). He could sit for six hours out of an eight hour day but not for more than thirty minutes at one time without a brief "change of position." (*Id.* at 582-83). He could stand or walk for no more than two hours out of an eight hour day, and not more than thirty minutes at a time. (*Id.* at 583). He could balance, crouch, and crawl occasionally, but very rarely. (*Id.*). He could stoop occasionally. (*Id.*). He could understand, remember, and execute moderately complex instructions and tasks, and should have no more than minimal interaction or collaboration with coworkers or the general public. (*Id.*).

The VE testified that a man with those disabilities retained the residual functional capacity to perform two semi-skilled, sedentary jobs: billing clerk and order clerk. (*Id.* at 586). However, on cross-examination, the VE admitted that a person who was incapable of sustaining concentration for several hours at a time either as a result of pain or taking narcotic medications would likely be unable to perform those jobs. (*Id.* at 591-93, 597).

13

### iv.    **Post-Hearing Proceedings**

The ALJ informed Plaintiff's counsel during the hearing that she was not prepared to accept Dr. Muche's 2007 questionnaire where she opined that Plaintiff met the definition of Listing § 1.04(A). (*Id.* at 548). The ALJ stated that Dr. Muche's opinion made no mention of motor loss, which is a required element for Listing § 1.04(A). (*Id.* at 548-50). As a result, Plaintiff sent a second set of interrogatories to Dr. Muche following the hearing. Dr. Muche completed the interrogatories in April of 2008 and she expounded on her earlier report. She again stated that Plaintiff was incapable of working a full time job. (*Id.* at 532). She found that, over the course of an eight hour work day, Plaintiff could sit, stand, or walk for less than one hour at a time. (*Id.* at 535). Her report indicated that Plaintiff could not bend, squat, crawl, or climb at all. (*Id.* at 536). She also said that the medications prescribed for Plaintiff would negatively affect his ability to work because they caused decreased concentration and dyscalculia - which is an impairment of mathematical ability. (*Id*). She concluded by stating that Plaintiff's condition had been at that severity for "3+ years" and that his condition was permanent. (*Id.* at 537).

Plaintiff also received a post-hearing consultative exam from Dr. Immanuel Amissah at the request of the ALJ. The examination occurred on April 11, 2009, over one year after the hearing was held. (*Id.* at 538). Dr. Amissah assessed lumbar disc disease with radiculopathy. (*Id.* at 539). Plaintiff was found to have decreased range of motion in the lumbar spine as well as decreased strength in his lower right extremity, resulting in declining mobility and standing tolerance. (*Id.* at 539-40).

14

**v.**   **Second Decision Denying Benefits**

Despite Dr. Muche's supplementary report and Dr. Amissah's consultative exam, ALJ Perkins issued a decision denying Plaintiff's application for disability benefits on July 6, 2010 - almost three years after the case was remanded to her by Judge Svet. (*Id.* at 303). She found that Plaintiff had several severe impairments, including discogenic and degenerative disease of the lumbar spine, status-post L3-4 foraminotomy, and status-post remote L5-S1 fusion. (*Id.* at 308). She found that Plaintiff did not meet the Listing definition for impairments of the spine under § 1.04(A) because there was no evidence of muscle or motor loss and no positive straight-leg raise test prior to December 31, 2004, both of which are required under the Listing. (*Id.* at 309-11). She rejected Dr. Muche's opinion that Plaintiff met the Listing definition for § 1.04(A), noting that the decision was rendered in August of 2007, more than two years after Plaintiff's last-insured date. (*Id.* at 312). The ALJ further discounted Plaintiff's contention that he met the Listing definition for § 1.04(C), claiming that there was no acceptable evidence of spinal stenosis or an inability to ambulate effectively prior to December 31, 2004. (*Id.* at 311-12).

The ALJ found that, based on the hypothetical she presented to the VE at the hearing, Plaintiff retained the residual functional capacity ("RFC") to perform other jobs - namely that of billing clerk and order clerk. While the ALJ acknowledged Dr. Sharp, Dr. Muche, and Dr. Erasmus' repeated diagnoses of spinal degeneration and the attendant limitations and pain, she claimed that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (*Id.* at 313).

In support of her position, the ALJ again specifically highlighted and accorded

15

substantial weight to Dr. Malizzo's statement from April of 2005 that he was unprepared to classify Plaintiff as totally and permanently disabled. (*Id.* at 315). She claimed that Dr. Malizzo's opinion was "consistent with the record as a whole" and she noted that Dr. Malizzo was a pain specialist. (*Id.*). She accorded substantial weight to Dr. Sharp's opinion that Plaintiff could sit for six hours out of an eight hour day and that he could both stand and walk for up to one hour each work day. (*Id.*). She nevertheless rejected his finding that Plaintiff was unable to work full time and that he would only be able to work 6-7 hours a day because "it is contradicted by his assessment of the claimant's abilities to sit, stand, and walk, which adds up to a total of eight hours." (*Id.*). She stated that Dr. Sharp's assessment "is very similar to my residual  functional capacity [assessment]" but did not address any further discrepancies between her RFC and Dr. Sharp's questionnaire.

The ALJ accorded little weight to Dr. Muche's repeated assessment that Plaintiff was disabled. (*Id.* at 315-16). She gave little weight to the 2005 loan discharge application wherein Dr. Muche stated that Plaintiff was unable to work because the form did not state from which date Plaintiff had become disabled and because Dr. Muche's opinion was "on an issue reserved to the commissioner." (*Id.* at 315). The ALJ accorded little weight to the 2007 and 2008 questionnaires completed by Dr. Muche because both questionnaires were completed over two and three years from Plaintiff's last-insured date, respectively. (*Id.* at 312, 315).

The ALJ acknowledged that Dr. Amissah's consultative exam revealed decreased range of motion in the lumbar spine, radiculopathy restricting Plaintiff's functional mobility, and positive straight-leg raise results from both the sitting and supine position. (*Id.* at 316). However, she contrasted those results with the negative straight-leg raise tests prior to

16

Plaintiff's last-insured date, and determined that Dr. Amissah's exam "suggests a worsening in the claimant's condition since December 31, 2004." (*Id.*).

Plaintiff filed objections to the ALJ's decision to the Appeals Council on July 28, 2010. (*Id.* at 296-302). The Appeals Council denied review on September 24, 2010. (*Id.* at 293-95). Therefore, ALJ Perkins' July 6 decision is the final decision for the purposes of this appeal. Plaintiff seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

**IV.**   **Analysis**

    **i.**   **The ALJ Did Not Err in Finding That Plaintiff Did Not Meet the Listing Definition for § 1.04**

Plaintiff's first contention is that his impairment should have been found to meet or equal the criteria for the Listing at § 1.04. (Doc. 16 at 9-15). Listing § 1.04, which governs disorders of the spine, is defined as:

> Disorders of the spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord with:
>
> A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitations of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
>                         * * * * *
>
> C.    Lumbar spinal stenosis resulting in pseudo-claudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as described in § 1.002B.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. Plaintiff contends that he meets the definition for both § 1.04(A) and (C). (Doc. 16 at 9-15). He claims that the repeated diagnoses of

severe back pain radiating into his lower right extremities, his coccygeal pain, and the limited range of motion in his back meet the requirements for Listing § 1.04(A). Most significantly, he notes that his treating physician, Dr. Julie Muche, stated in her post-remand questionnaire that Plaintiff met the definition of Listing § 1.04(A). (*Id.* at 12-14).

The Commissioner responds that Plaintiff does not meet the definition of Listing § 1.04(A) because his symptoms, while severe, did not include several crucial elements contained in the Listing. (*See* Doc. 17 at 5-8). Specifically, the Commissioner argues that the medical records did not indicate any persistent motor loss or positive straight-leg raise test prior to December 31, 2004. (*Id.*). The Court concurs.

As noted by the Commissioner, Plaintiff's straight-leg raise test was negative when he visited Dr. Sharp on July 2, 2004. (Doc. 17 at 6; AR at 448). Plaintiff's straight-leg raise test was also negative when he was seen by Dr. Muche on July 26, 2004. (AR at 439). During his neurosurgery consult with Dr. Erasmus on August 19, 2004, Plaintiff's straight-leg raise test was again negative. (*Id.* at 208). Plaintiff did not record a positive straight-leg raise test until February 3, 2005, when he was examined by Dr. Malizzo at Lovelace Medical Center. (*Id.* at 503). While Plaintiff continued to have positive straight-leg raise results following the February 3 visit, all of those tests occurred after Plaintiff's last insured date of December 31, 2004.

Plaintiff has the burden of proving that his disability meets or equals one of the Listings of presumptively disabling impairments. *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Because Plaintiff has not shown any evidence in the record of a positive straight-leg raise test prior

18

to December 31, 2004, the Court is compelled to find that he has not met his burden. ALJ Perkins was entitled to give little weight to Dr. Muche's 2007 opinion that Plaintiff met the Listing definition for § 1.04(A) since there was no evidence of positive straight-leg raise tests prior to the last-insured date. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (noting that an ALJ need not give controlling weight to a treating physician's opinion which is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record . . .").

Neither has Plaintiff established that his impairment meets the Listing definition for § 1.04(C). The Commissioner contends that Plaintiff was not suffering from spinal stenosis or an inability to ambulate effectively prior to December 31, 2004, both of which are required to meet the Listing definition at § 1.04(C). (Doc. 17 at 8-10; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(C)). The Commissioner's argument with regard to spinal stenosis is contradicted by the record since Dr. Erasmus found that Plaintiff was suffering from spinal stenosis after examining Plaintiff's MRI results on September 30, 2004. (AR at 206). Nevertheless, this error is not material since there is no evidence in the record that Plaintiff's impairments resulted in an inability to ambulate effectively.

Under the Social Security regulations, an "inability to ambulate effectively" is defined as

> [An] extreme limitation of the ability to walk, such as having insufficient lower extremity functioning to permit independent ambulation without the use of a handheld device. Examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches, or two canes, the inability to walk a block at a reasonable pace, and the inability to carry out routine ambulatory activities such as shopping and banking, etc.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b. Plaintiff argues that Dr. Sharp's finding that

19

Plaintiff could stand or walk for no more than an hour at a time and for only one hour a day proves that Plaintiff was unable to ambulate effectively. (Doc. 16 at 12). The Court is not persuaded that the limitations described in Dr. Sharp's questionnaire rise to the "extreme limitation of the ability to walk" described in the Social Security regulations. While Plaintiff described a fair number of limitations resulting from his constant back pain, the record suggests that Plaintiff was able to ambulate adequately. For example, in November of 2004, Plaintiff reported that he was walking in and out of his house two times per day and he was advised to increase his ambulation regimen. (AR at 204). Plaintiff's wife, Sharon Marquez, filled out a third party function report on January 8, 2005, in which she stated that Plaintiff would go walking at the track and that he could walk for half a mile before he had to stop. (*Id.* at 73). At his second administrative hearing in March of 2008, Plaintiff testified that he could walk up to two miles. (*Id.* at 579). For those reasons, the Court finds that Plaintiff has not met his burden of proving that his impairment meets or equals the Listing for spinal disorders at § 1.04(A), (C).

ii.  **The ALJ Erred in Failing to Consider all of the Limitations Borne Out by the Record**

Plaintiff presents several facets of one central argument: that the ALJ's findings in the RFC with respect to, 1) Plaintiff's physical ability to sustain full-time sedentary work and, 2) the limiting effect of Plaintiff's medications on his ability to concentrate while at work, were not supported by substantial evidence. (*Id.* at 16, 19-21). For example, Plaintiff claims that the ALJ failed to ensure that an adequate record of Plaintiff's limitations was developed at the second hearing in March of 2008. (Doc. 16 at 16-18, 20-21). Plaintiff argues that the hypothetical question to the VE was similarly flawed because it was based on an improper

RFC. (*Id.* at 19-21). Beyond this central allegation, Plaintiff claims that the ALJ failed to resolve a conflict between the ALJ's RFC - which included limitations on Plaintiff's ability to interact with coworkers and the public - and the VE's determination that Plaintiff could work at least one job requiring significant interaction with the public. (*Id.* at 20). He further disputes that his past relevant work provided sufficient transferable skills such that Plaintiff could be considered qualified to preform the jobs identified by the VE. (*Id.*).

a.    <u>**The ALJ Did Not Develop an Adequate Record**</u>

Plaintiff argues that the ALJ did not allow his attorney to elicit testimony at the second hearing regarding 1) the limiting effect of Plaintiff's pain medications on his ability to concentrate and maintain attention while at work, and 2) the effect of Plaintiff's back pain on his physical ability to sit, stand, and walk for extended periods of time and work a full-time sedentary job. (*Id.* at 16, 18-19, 21). The Commissioner maintains that evidence was presented at the hearing regarding Plaintiff's physical abilities and that the ALJ properly considered the effect of Plaintiff's medications on his ability to concentrate. (Doc. 17 at 12-13, 15-16).

Before considering the merits of Plaintiff's argument, the Court first notes that Plaintiff presents the ALJ's failure to develop the record as an error at step five of the sequential evaluation process. (*See, e.g.*, Doc. 16 at 15-16 (outlining the applicable standard for review at step five of the evaluative process)). However, failure to develop a record at the administrative hearing is an error at step four of the process. At step four of the process, the ALJ must make a determination of the claimant's residual functional capacity after considering the impairments that have been borne out by the record. *See,*

*e.g.*, *Henrie v. U.S. Dept. Of Health & Human Services*, 13 F.3d 359, 361 (10th Cir. 1993).[6] The ALJ must then determine, based on that RFC, whether the claimant is capable of returning to his or her past occupation. 20 C.F.R. § 404.1520(e). A failure to develop the record is an error at step four of the process because it prevents the ALJ from accurately determining which impairments have been borne out by the record and, as a result, which impairments will be included in the RFC. *Henrie*, 13 F.3d at 361; *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994) (Noting that improper RFC findings "may have sprung from [the ALJ's] failure to develop a sufficient record on which those findings could be based."). In this case, Plaintiff claims that the ALJ's RFC failed to include all of the limitations borne out by the record and that this was partially due to the ALJ's failure to allow his attorney to elicit relevant evidence regarding his limitations. This was an error at step four the process, and not at step five as Plaintiff argues. The distinction is material since Plaintiff still bears the burden of proof at step four. *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1998). The Court now turns to the merits of Plaintiff's claim.

In every Social Security case, the ALJ has a basic obligation to ensure that an adequate record is developed during the disability hearing consistent with the issues raised. *See Musgrave v. Sullivan*, 966 F.3d 1371, 1374 (10th Cir. 1992); Soc. Sec. R. 96-8p, 1996 WL 374184, at *5. The is true despite the presence of counsel, although the duty is heightened with the claimant in unrepresented. *Thompson v. Sullivan*, 987 F.2d 1482, 1492

---

[6] Although an ALJ will technically formulate an RFC in between steps three and four of the sequential evaluation process, *see* 20 C.F.R. § 404.1520(a)(4)*,* formulation of the RFC is frequently considered to occur at step four since the RFC is first used at step four in determining whether the claimant is capable of performing his or her past relevant work. *See, e.g.*, *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (stating that the RFC is determined at step four).

(10th Cir. 1993). The ALJ must inquire into the facts of Plaintiff's case such that the ALJ is informed about "facts relevant to his decision and [learns] the claimant's own version of those facts." *Dixon v. Heckler*, 811 F.2d 506, 510, (10th Cir. 1987) (quoting *Heckler v. Campbell*, 461 U.S. 458, 471 n.1 (1983) (Brennan, J., concurring)); Soc. Sec. R. 96-7p at n. 3. The Tenth Circuit has held that the length of the hearing is not necessarily dispositive. *Thompson*, 987 F.2d at 1492. "[T]he more important inquiry is whether [sufficient questions were asked] to ascertain (1) the nature of a claimant's alleged impairments, (2) what on-going treatment and medication the claimant is receiving, and (3) the impact of the alleged impairment on a claimant's daily routine and activities." *Id.* (quoting *Musgrave*, 966 F.2d at 1375 (10th Cir. 1992)).

### i.    Ability to Concentrate

Plaintiff testified at the second hearing that, following the back injury in May of 2004, he was reduced to lying in bed, taking medications, and reading. (*Id.* at 567-68). He found that he couldn't remember things well and couldn't focus. (*Id.* at 567-69). Plaintiff's attorney attempted to link the loss of concentration and lack of focus to the medications he was taking and she asked whether they caused any "side effects or fatigue." (*Id.* at 571). Plaintiff replied in the affirmative, but no further testimony was developed regarding those side effects because the ALJ interjected to explain that she did not have all of Plaintiff's medical records extending past 2005. (*Id.* at 571-72). Plaintiff's attorney attempted to continue her examination but the ALJ interrupted again and began questioning him regarding his physiotherapy regimen.  (*Id.* at 572-74, 576-80). The ALJ did ask about Plaintiff's medications, but the questions were perfunctory and did not address their effect on Plaintiff's ability to concentrate, remember tasks, or stay alert. (*Id.* at 574-75 (the ALJ

asked only three questions about Plaintiff's medications: 1) which medications he took, 2) what time he took them, and 3) whether he had taken them on the day of the hearing)). After asking her own questions, ALJ Perkins ended the examination of Plaintiff and began taking testimony from the VE. (*Id.* at 580-81).

When Plaintiff's counsel was afforded an opportunity to examine the VE, counsel objected that she was unable to do so effectively because the ALJ had prevented her from developing Plaintiff's testimony regarding the limiting effect of both his pain and his medications.

> I'm feeling like I have a problem here in that we didn't get any testimony as to Mr. Marquez's functional [capacity,] . . . [to] sit/stand walk . . . He's also got pain producing conditions and is on morphine. And we didn't get any testimony . . . [about] the fatigue, the need for rest breaks. And we also didn't get an opportunity to discuss how the combined effects of pain and taking morphine and taking some of these other medications affects his mental ability . . . And now I can't cross-examine the VE, without covering [those issues], because that's really the crux of my issue is that a lot of these jobs [identified by the VE] would require the attention, concentration, mental [abilities] . . .

(*Id.* at 587-88). Plaintiff's attorney explained that Plaintiff typically felt "wiped out" after taking his narcotic medications and that, when combining the cumulative effect of the pain and the narcotics, Plaintiff was unable to work for a full day without taking a nap or significant breaks. (*Id.* at 589-90). Plaintiff's attorney complained that, because she had not been given an opportunity to develop this evidence, those restrictions were not included in the RFC or the hypothetical question to the VE. The ALJ responded by stating that such testimony could be developed through cross-examining the VE. (*Id.* at 591). Plaintiff's attorney then asked the VE whether someone would be able to adequately perform the two clerk jobs he identified if they could not maintain concentration or were frequently "spacing out" as a result of pain medications. (*Id.* at 591, 593-94, 597). The VE responded that

performing those jobs required continuous periods of concentration, that accuracy was important for both jobs, and that "spacing out" wouldn't be tolerated. (*Id.* at 591, 593-94, 597).

The Commissioner contends that Plaintiff had an opportunity to testify about the limiting effect of his medications at the hearing. Specifically, he notes that the ALJ and Plaintiff's counsel discussed Plaintiff's concentration and memory at the hearing. (Doc. 17 at 15, n. 9). More importantly, he claims that it was Plaintiff's attorney's duty to elicit the testimony regarding his inability to concentrate and that "the ALJ should be entitled to rely on counsel to structure and present the case in a way that adequately explores the claimant's assertions." (*Id.*) (citing *Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004)). While it is true that an ALJ may ordinarily rely on the attorney to structure and present the claimant's testimony, in this case the ALJ prevented Plaintiff's attorney from doing so. The ALJ cut off Plaintiff's attorney several times as she attempted to develop testimony regarding Plaintiff's limitations.

The truncated nature of the testimony at the second hearing becomes clear when contrasted against the testimony that was developed at the original hearing in November of 2005. At the original hearing, Plaintiff's attorney was able to ask detailed questions regarding the side effects of Plaintiff's medication. (*Id.* at 263-67). Plaintiff testified that the medications - Robaxin in particular - made him very tired; that he would take them after trying to work and would frequently fall asleep for several hours. (*Id.* at 263-64, 266). He also explained that the medications were having a significant effect on his cognitive ability to concentrate and remember. (*Id.* at 271-72). He explained how the medications made him "a lot slower" to answer questions and think critically, and that he usually could not maintain

25

his attention span for more than forty-five minutes to an hour. (*Id.* at 272-73). He stated that, after approximately forty-five minutes of reading, he would have to start re-reading passages since he would become forgetful or simply lose focus. (*Id.*). When Plaintiff's attorney questioned the VE and asked whether Plaintiff's inability to concentrate would prevent him from working as a billing or data entry clerk, the VE flatly replied that it would. (*Id.* at 288).

Contrary to the Commissioner's assertions that Plaintiff was permitted to present all relevant testimony regarding his limitations and that any inability to do so was the fault of his attorney, the Court finds that the ALJ did not develop an adequate record at the second hearing. In her decision, the ALJ stated that she would not consider the VE's testimony that an inability to concentrate or maintain attention would prevent Plaintiff from working the two clerk jobs he identified because "the record, as a whole, does not support [an inability to concentrate] during the time period on or before . . . December 31, 2004." This particular limitation, however, may have been supported by the record if the ALJ had not prevented Plaintiff from developing testimony about that specific limitation at the hearing. As noted above, the purpose of developing a record at the hearing is to ensure that the ALJ is apprised of "(1) the nature of a claimant's alleged impairments, (2) what on-going treatment and medication the claimant is receiving, and (3) the impact of the alleged impairment on a claimant's daily routine and activities." *Musgrave v. Sullivan*, 966 F.3d 1371, 1375 (10th Cir. 1992). Plaintiff's ability to concentrate and maintain focus were clearly relevant to the nature of his impairments and affected his daily routine and activities. This ALJ's failure to develop testimony regarding this impairment is significant since the VE testified that an inability to concentrate or maintain attention would likely preclude Plaintiff from performing

the two clerk jobs identified at the hearing.  (AR at 591, 593-94, 597). As Plaintiff's attorney put it, Plaintiff's inability to concentrate or focus was the  "crux of [the] issue." (*Id.* at 588).

By preventing Plaintiff from testifying to the limiting effect of his medications, the ALJ was prevented from accurately considering whether to include a concentration limitation in her RFC. Failure to properly develop the record constitutes legal error and is therefore grounds for remanding this case to the Commissioner for Social Security for rehearing. Further, on remand, the findings or explanations regarding the effect of Plaintiff's medications on his ability to concentrate should be clarified in the RFC.

### ii.    Physical Limitations

Plaintiff's attempt to testify regarding the effect of his back pain on his ability to perform sedentary work was similarly circumscribed at the second hearing. Plaintiff testified that his physical abilities were limited following the back injury; he was unable to perform household chores and he spent most days taking medications and lying down. (*Id.* at 567). While Plaintiff's attorney was eliciting testimony regarding Plaintiff's back pain, the ALJ cut her off and began asking questions about Plaintiff's physiotherapy exercises and his walking regimen.  (*Id.* at 572-74, 576-80). Plaintiff explained the type of exercises he performs at home and stated that he was walking up to two miles a day. (*Id.* at 576-80). After asking her own questions, ALJ Perkins ended the examination of Plaintiff and began taking testimony from the VE. (*Id.* at 580-81).  Plaintiff's attorney did not get an opportunity to ask about Plaintiff's ability to sit for extended periods of time or to sustain a full-time sedentary job.

Plaintiff's attorney objected to the testimony being cut short, stating that Plaintiff would have testified that the back pain prevented him from working for a full day without

taking a nap or significant breaks. (*Id.* at 589-90). Plaintiff contends that such testimony, along with the medical evidence in the record, would have shown that Plaintiff was incapable of consistently sitting for six out of eight hours in a work day or from working full time at all. (Doc. 16 at 19-20).

The ALJ responded that she had asked Plaintiff about his ambulation regimen and that he had admitted to walking two miles a day at the track. (*Id.* at 589). The ALJ felt that this testimony, combined with her observation that Plaintiff was able to sit still for a half hour during the hearing without having taken any medication was sufficient to  support her RFC finding that Plaintiff could sit for six out of eight hours in a day with no more than a short "change of position" every thirty minutes. (*Id.*).

Again, a comparison between the first and second hearings illustrate the degree to which the ALJ limited Plaintiff's testimony. During  the first hearing, Plaintiff's attorney was able to develop significant testimony regarding Plaintiff's ability to sit, stand, and walk for extended periods of time and his ability to work full time. He stated that he couldn't sit in one place for longer than twenty or thirty minutes before he began to experience severe back pain. (*Id.* at 262-63). After thirty minutes of sitting and working, He would usually have to take his pain medication and lie down for several hours. (*Id.* at 263-64). Because of the back pain, he could not stand straight or walk continuously for more than twenty minutes before he needed a place to sit down. (*Id.* at 268-69). Simple tasks such as grocery shopping or doing the dishes became difficult because of his inability to stay on his feet. (*Id.*). His attorney noted during the hearing that Plaintiff actually had to get up and move around several times because of the discomfort. (*Id.* at 262, 269).

The Court finds that the ALJ failed to adequately develop the record at the second

hearing by cutting short testimony regarding Plaintiff's physical limitations. While there was medical evidence in the record regarding Plaintiff's ability to sit, stand, and walk for extended periods of time - such as Dr. Sharp's questionnaire from July of 2005 - the ALJ failed to develop the record when she prevented Plaintiff from explaining in his own words what his limitations were during the relevant period. *See, e.g.*, *Thompson v. Sullivan*, 987 F.2d 1482, 1492 (10th Cir. 1993) (noting that, by conducting a ten minute hearing and failing to "ask[ ] enough questions or the right questions[,]" the ALJ failed to develop the record and support her findings regarding claimant's credibility and RFC level). This prevented the ALJ from considering all of the relevant evidence in determining Plaintiff's RFC.[7]

## V.    Conclusion

For the reasons stated above, the Court **FINDS** that the ALJ failed at step four to develop the record with regard to Plaintiff's physical and mental limitations in formulating her RFC. Having found that the step four error discussed herein is dispositive on remand, the Court need not address Plaintiff's claims of error at step five. (Doc. 16 at 20).  Plaintiff's *Motion to Remand or Reverse the Administrative Agency Decision* (Doc. 15), is hereby **GRANTED**. Because this will be the second remand of Plaintiff's case, the Court recommends that the Hearing Office Chief Administrative Law Judge assign this case to

---

[7] Plaintiff's argument with regard to the development of the record can also be characterized as an argument that the ALJ's RFC determination was not supported by substantial evidence. (Doc. 16 at 16). However, because the Court's decision requires the Commissioner to consider those limitations on remand, the Court need not consider this alternative argument.

an ALJ who has had no contact with Plaintiff.[8]

_____
THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE

---

[8] The Commissioner's "Hearings, Appeals and Litigation Law Manual" ("HALLEX") states that, in the case of a second remand, the ALJ who issued the previous decisions should not be reassigned. *See* HALLEX § 1-3-7-40(D). *Available at* *http://www.socialsecurity.gov/OP_Home/hallex/I-03/I-3-7-40.html*